**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KLEOPATRA FINCO S.À R.L., *et al.*,[1] | ) | Case No. 25-90642 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION**
**FOR ENTRY OF AN ORDER (I) AUTHORIZING**
**THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER**
**COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE THE**
**COMPENSATION AND BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than 3:00 p.m. (prevailing Central Time) on November 5, 2025.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on November 5, 2025, at 3:00 p.m. (prevailing Central Time) in Courtroom 402, 4th floor, 515 Rusk Street, Houston, Texas 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153.  Video communication will be by use of the GoTo platform.  Connect via the free GoTo application or click the link on Judge Lopez's home page.  The meeting code is "JudgeLopez".  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings.  To make your appearance, click the "Electronic Appearance" link on Judge Lopez's homepage.  Select the case name, complete the required fields, and click "Submit" to complete your appearance.**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") state

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Klockner.  The location of Kleopatra Finco S.à r.l.'s principal place of business and the Debtors' service address in these chapter 11 cases is 46A, Avenue J.F. Kennedy, L-1855 Luxembourg, R.C.S. Luxembourg.

the following in support of this motion:[2]

<h2 align="center">Relief Requested</h2>

1.     The Debtors seek entry of an order, substantially in the form attached hereto (the "Order"): (a) authorizing, but not directing, the Debtors to (i) pay and honor all of the Compensation and Benefits Programs (as defined herein), and (ii) continue to administer the Compensation and Benefits Programs in the ordinary course of business, including payment of prepetition obligations related thereto and (b) granting related relief.

<h2 align="center">Jurisdiction and Venue</h2>

2.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference to Bankruptcy Judges*, entered May 24, 2012, from the United States District Court for the Southern District of Texas.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

---

[2]     A detailed description of the Debtors and their business, including the circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Marc Rotella, Chief Financial Officer of Kleopatra Finco S.à r.l., in Support of First Day Motions*, filed contemporaneously herewith (the "First Day Declaration"). Capitalized terms used but not defined in this motion shall have the meanings ascribed to them in the First Day Declaration.

2

Rules"), and rule 9013-1(i) of the Bankruptcy Local Rules for the Southern District of Texas

(the "Bankruptcy Local Rules"), and the *Procedures for Complex Cases in the Southern District*

*of Texas* (the "Complex Case Procedures").

## Background

5.      On November 4, 2025 (the "Petition Date"), the Debtors commenced filing

voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating

their business and managing their property as debtors in possession pursuant to sections 1107(a)

and 1108 of the Bankruptcy Code.  Concurrent with the filing of this motion, the Debtors filed a

motion requesting procedural consolidation and joint administration of these chapter 11 cases

pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner

has been made in these chapter 11 cases, and no official committees have been appointed or

designated.

## The Debtors' Workforce

6.      As of the Petition Date, the Debtors employ approximately 3,000 full-time,

part-time, and temporary employees across over fourteen countries.[3]  Over 800 employees are

located in the United States (the "U.S. Employees"), with the remainder located outside of the

United States (the "Non-U.S. Employees").  More specifically, the Debtors' workforce consists

of approximately 2,900 full-time employees (the "Full-Time Employees") and fewer than 70

part-time employees (the "Part-Time Employees" and collectively with the U.S. Employees,

Non-U.S. Employees, and Full-Time Employees, the "Employees").  Additionally, the Debtors

employ approximately 80 temporary employees (the "Temporary Employees") who are primarily

---

[3]      The Debtors' Employees are located in countries, including, the United States, Spain, Netherlands, Poland, Italy,
the United Kingdom, Germany, France, Denmark, the Czech Republic, Austria, the Republic of North Macedonia,
Egypt, and Ireland.

hired through staffing agencies (the "Staffing Agencies") and, for certain Non-U.S. Employees through professional employer organizations (the "PEO" and together with the Staffing Agencies, the "Temporary Employment Agencies"), on an as-needed basis. Temporary Employees are paid by the Debtors through payments to the Temporary Employment Agencies who directly pay the Temporary Employees.

7.      The Employees include personnel who are intimately familiar with the Debtors' business, processes, and systems, and possess unique skills and experience with respect to the Debtors' business. Many of the Employees perform a wide variety of functions critical to the operations at the Debtors' manufacturing plants and research and development sites. Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be replaced.

8.      While U.S. Employees are not currently unionized, certain Non-U.S. Employees are members of foreign labor unions (the "Unions," and such employees, the "Union Employees"). A list of the Unions with which certain of the Debtors' Employees maintain memberships is attached hereto as **Exhibit A**.

9.      The vast majority of the Employees rely exclusively on the Compensation and Benefits Programs to pay their daily living expenses and support their families. These Employees will be exposed to significant financial hardship if the Debtors are not permitted to continue paying their wages and salaries and providing health and other benefits in the ordinary course during these chapter 11 cases. Furthermore, the Debtors and their estates will also be harmed if they are unable to provide the Compensation and Benefits Programs to their Employees consistent with past practice. The Employees are the lifeblood of the Debtors' business. The Employees' skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential

to preserving operational stability and efficiency. Simply put, without the continued, uninterrupted services of the Employees, the Debtors' business operations would suffer immediate and irreparable harm and their restructuring efforts would be materially impaired. Consequently, the relief requested herein is necessary and appropriate.

## **Compensation and Benefits**

10. To minimize the personal hardship Employees would suffer and potential Employee attrition that likely would follow if prepetition compensation and benefits obligations are not paid or remitted when due or as expected, the Debtors seek authority, but not direction, to pay and honor certain prepetition claims and continue to honor obligations on a postpetition basis, as applicable, relating to, among other things: (a) Compensation and Withholding Obligations; (b) Employee Benefits Programs; (c) Union Contributions; (d) Non-Employee Manager Compensations; and (e) certain other compensation and benefits that the Debtors provide in the ordinary course (each as defined below and collectively, the "Compensation and Benefits Programs"). In addition, the Debtors also seek to pay all costs incidental to the Compensation and Benefits Programs.

11. The Debtors seek to continue their applicable prepetition Compensation and Benefits Programs in the ordinary course of business on a postpetition basis and pay all necessary costs related thereto. Out of an abundance of caution, the Debtors further request confirmation of their right to modify, change, and/or discontinue any of their Compensation and Benefits Programs, and to implement new programs, policies, and benefits on a postpetition basis in the ordinary course of business, in the Debtors' sole discretion, and without the need for further Court approval, subject to applicable law.

12.     As set forth below, the Debtors seek authority, but not direction, to make the following payments or reimbursements of the following prepetition amounts owed in connection with the Compensation and Benefits Programs:

| Relief Sought | Prepetition Amounts[4] |
|---|---|
| **Compensation and Withholding Obligations** | **$22,140,000** |
| Employee Compensation | $1,900,000 |
| Temporary Employment Agencies Obligations | $1,800,000 |
| Reimbursable Expenses | $400,000 |
| Non-Insider Bonus Programs | $5,300,000 |
| Non-Insider Severance Program | $1,640,000 |
| Social Plan Obligations | $4,800,000 |
| Withholding Obligations (Payroll Deductions & Payroll Taxes) | $6,100,000 |
| Payroll Processing Fees | $200,000 |
| **Employee Benefits Programs** | **$10,370,000** |
| Health and Welfare Coverage and Benefits | $3,400,000 |
| Life and Disability Insurance Coverage | $140,000 |
| Workers' Compensation | $530,000 |
| 401(k) Plan | $300,000 |
| Time-Off Benefits | $5,000,000 |
| Additional Benefit Programs | $1,000,000 |
| **Union Contributions** | **N/A** |
| **Non-Employee Manager Compensation** | **N/A** |
| **Total** | **$32,510,000** |

## I.    Compensation and Withholding Obligations.

13.     The Debtors owe their Employees various compensation and withholding obligations, including, among others, Employee Compensation, Temporary Employment Agencies Obligations, Reimbursable Expenses, Non-Insider Bonus Programs, Non-Insider Severance Program, Social Plan Obligations, Withholding Obligations, and Payroll Processing

---

[4]     Monetary amounts stated herein originally denominated in euros or other currencies have been converted to the United States dollar based on current exchange rates retrieved at the close of business on October 31, 2025 (prevailing Eastern Time).

Fees (each as defined herein and, collectively, the "Compensation and Withholding Obligations").

14.     As of the Petition Date, the Debtors estimate that they owe approximately $22,140,000 on account of the Compensation and Withholding Obligations.  Accordingly, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts owed on account of the Compensation and Withholding Obligations and to continue paying the Compensation and Withholding Obligations on a postpetition basis in the ordinary course and consistent with prepetition practice.

**B.     Employee Compensation.**

15.     In the ordinary course of business, the Debtors pay wages, salaries, and other compensation (the "Employee Compensation") to their Employees on a weekly or monthly basis, depending on the Employees' locations and roles.  Because certain Employees are paid in arrears, and certain Employees are paid monthly, certain Employees and former Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date.  Employee Compensation may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees.

16.     The Debtors typically pay Employee Compensation by direct deposit through electronic transfer of funds to the Employees' bank accounts with a small portion of the U.S. Employees receiving checks from ADP, their payroll administrator.  On average, the Debtors paid approximately $13 million per month on account of Employee Compensation for the 12 months immediately preceding the Petition Date.  As of the Petition Date, the Debtors estimate that they owe approximately $1,900,000 in accrued but unpaid Employee Compensation (the "Unpaid

Employee Compensation"). The Debtors seek authority, but not direction, to pay any Unpaid Employee Compensation, including amounts that may have accrued or been incurred prior to the Petition Date and to continue to pay the Employee Compensation on a postpetition basis in the ordinary course of business and consistent with past practice.

### C.    Temporary Employment Agencies

17.    The Debtors retain certain Temporary Employees indirectly through Temporary Employment Agencies. The Temporary Employment Agencies pay the base salaries, hourly wages, and, in certain cases, benefits of the applicable Temporary Employees. The Debtors make monthly lump-sum payments to the Temporary Employment Agencies on account of the amounts owed to the Temporary Employees and applicable fees to the Temporary Employments Agencies (such amounts, collectively with all amounts paid from the Debtors to Temporary Employment Agencies, the "Temporary Employment Agencies Obligations").

18.    As of the Petition Date, the Debtors estimate that they owe approximately $1,800,000 in accrued but unpaid Temporary Employment Agencies Obligations. The Debtors seek authority, but not direction, to pay any unpaid Temporary Employment Agencies Obligations, including amounts that may have accrued or been incurred prior to the Petition Date and to continue to pay the Temporary Employment Agencies Obligations on a postpetition basis in the ordinary course of business and consistent with past practice.

### D.    Reimbursable Expenses

19.    In the ordinary course of business, the Debtors reimburse certain Employees for pre-approved expenses incurred within the scope of their employment (the "Reimbursable Expenses"). The Debtors expect that the Employees will continue to incur necessary Reimbursable Expenses in connection with the Debtors' business operations. Reimbursable Expenses typically include out-of-pocket expenses associated with transportation, lodging, meals,

rental cars, and other expenses incurred in connection with business related travel, as well as relocation services in circumstances where Employees move to a new country in connection with their service to the Debtors.

20.     In connection with the Debtors' reimbursement program, certain Employees are provided with corporate credit cards (the "Corporate Credit Cards") that they use for reimbursable expenses.[5]  The Debtors have issued Corporate Credit Cards to approximately 160 Employees, each in the Employee's own name.  The Debtors pay the outstanding balances on corporate credit cards issued to Employees.  Employees are required to submit expense reports to their managers in order to substantiate and obtain approval for business-related expenditures, including travel and other work-related purchases.  Without the Debtors' payment of the credit card obligation, Employees may be held personally liable for any unpaid obligations.  The Debtors' inability to pay such expenses would impose significant financial hardship on such individuals where the obligations were incurred for the Debtors' benefit.  Moreover, although the Debtors require that reimbursement requests be promptly submitted, delays in submission or processing can occur, and Employees may submit reimbursement requests for, or obtain approval of, prepetition Reimbursable Expenses after the Petition Date.  The Debtors are seeking relief to pay the accrued but unpaid Reimbursable Expenses arising from the Corporate Credit Cards in the Cash Management Motion.  Accordingly, those amounts are not included in the relief requested for Reimbursable Expenses herein.

---

[5]     Please see *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions and (II) Granting Administrative Expense Status to Postpetition Intercompany Claims, and (III) Granting Related Relief* (the "Cash Management Motion"), filed contemporaneously herewith, for additional discussion regarding the Debtors' credit card program.

21.     For U.S. Employees, in certain circumstances, expenses are reimbursed through ACH payments directly into the U.S. Employees' bank accounts, which is administrated by the third-party expense report provider Emburse, Inc. (formerly doing business as Chrome River). For Non-U.S. Employees, expenses are reimbursed either directly through payment into the Non-U.S. Employees' bank accounts or the payment is included in the Employees upcoming payroll.  Typically, Employees must submit receipts for approval from their managers to receive a reimbursement.    Once the managers determine that such charges comply with the reimbursement policies and procedures, the Debtors will proceed to reimburse the Employee.

22.     As of the Petition Date, the Debtors estimate that they owe approximately $400,000 in the aggregate on account of accrued but unpaid Reimbursable Expenses payable directly to Employees through ACH payments.    Accordingly, the Debtors request authority, but not direction, to satisfy any accrued but unpaid prepetition Reimbursable Expenses and to continue to pay the Reimbursable Expenses on a postpetition basis in the ordinary course and consistent with prepetition practice.

### E.     Non-Insider Bonus Programs.

23.     In the ordinary course of business, the Debtors maintain five bonus programs (collectively, the "Non-Insider Bonus Programs") for certain Employees who are not "Insiders" of the Debtors.[6]  The Non-Insider Bonus Programs (each as defined below) are comprised of

---

[6]     For the avoidance of doubt, the Debtors are not requesting authorization to pay any insiders (as that term is defined in section 101(31) of the Bankruptcy Code) (the "Insiders") (i) on account of the Non-Insider Bonus Programs or (ii) any amounts in excess of the Priority Cap.  For the avoidance of doubt, the Debtors reserve all rights with respect to the classification of any Employee as an "Insider," and no description of any Compensation and Benefits hereunder indicating that such Compensation and Benefits covers or is made available to "Insiders" or "non-Insiders" shall be construed as an admission or concession by the Debtors that any Employee of the Debtors is an "Insider."

(i) the Sales Bonus Plan, (ii) the Customer Service Bonus Plan, (iii) the Profit-Sharing Bonus Plan, (iv) the Global Bonus Plan, and (v) the Local Bonus Plans.

24.     The Debtors currently offer a program targeted at their sales employees (the Sales Bonus Plan"), which is designed to provide financial incentive bonuses to eligible sales Employees whose contributions support the successful achievement of the Debtors' financial goals.  Bonuses under the program are paid (a) in the second month following the end of the quarter for the first, second, and third quarters, and (b) as part of an annual true up payment in the third month following the fourth quarter.  Each Employee's payout under the quarterly bonus program is determined by several performance-related factors, subject to a fifteen-percent minimum payout amount, and contingent upon the Employee's continued employment with the Debtors through the last day of the performance period.

25.     The Debtors also offer a program designed for Employees in the customer service department (the "Customer Service Bonus Plan").  Under the Customer Service Bonus Plan, eligible Employees can receive between a fifteen and two-hundred-percent payout tied to certain financial and personal objectives and metrics.  Bonuses earned under the Customer Service Bonus Plan will be paid out to Employees in March of 2026, though to receive the bonus, the Employee must remain actively employed throughout the end of the 2025 calendar year.

26.     Additionally, the Debtors offer Profit-Sharing bonus programs to certain Non-U.S. Employees (collectively, the "Profit-Sharing Bonus Plans," and each individually, a "Profit-Sharing Bonus Plan").  Under the Profit-Sharing Bonus Plan in Germany, eligible Employees receive payouts tied to financial targets, but at a minimum of one month's salary. Eligible Employees receive eighty percent of this one-month salary in November and the remainder in March of the following year.  If financial metrics exceed target levels, eligible

Employees can receive up to a one-hundred and sixty percent payout of their monthly salary, in aggregate.   In France, eligible Employees can receive payouts up to €3,100 (approximately $3,600), typically paid within the first five months of the following calendar year, based on certain metrics including, but not limited to, performance, attendance, and achieving certain financial targets.   Employees eligible for the Profit-Sharing Bonus Plans do not participate in the Sales Bonus Plan or Global Bonus Plan (as defined below).

27.     The Debtors also offer a program for management-level Employees who do not participate in the Sales Bonus Plan (the "Global Bonus Plan").   Under the Global Bonus Plan, eligible Employees can receive bonuses based on performance metrics.   The bonuses are generally paid out in March following the close of the calendar year.   Historically, the Global Bonus Plan was offered to certain Insiders.   However, there are not any prepetition amounts owed under the Global Bonus Plan to Insiders nor will any such amounts accrue postpetition.

28.     Finally, the Debtors offer certain local bonuses specific to individual locations (the "Local Bonus Plans").   Certain of the Local Bonus Plans are determined based on a variety of factors tied to particular locations.   These various factors are based on certain location-specific targets such as performance, yields, safety control, and plant-specific economic performance.   Such bonuses are generally paid out yearly in March following the close of the financial year.   There are certain other Local Bonus Plans including, but not limited to, payments related to annual holiday bonuses, career-anniversaries, union membership, and spot recognition that are paid throughout the Calendar Year.

29.     The Non-Insider Bonus Programs are integral to maintaining employee morale and loyalty and minimizing attrition and operational disruption during these chapter 11 cases.   Indeed, the Non-Insider Bonus Programs generally align eligible Employee's interest with those of the

Debtors by linking payments under the Non-Insider Bonus Programs to the overall performance and efficiency of the Debtors' operations.  Further, the Debtors believe that most Employees who are eligible for awards under the Non-Insider Bonus Programs view such awards as an integral part of their overall compensation and rely on such awards to pay their living expenses and support their families.

30.    As of the Petition Date, the Debtors estimate that they owe approximately $5,300,000 in the aggregate on account of the Non-Insider Bonus Program.  The Debtors seek authority, but not direction, to: (a) pay the prepetition amounts due under the Non-Insider Bonus Programs; and (b) continue the Non-Insider Bonus Programs on a postpetition basis in the ordinary course of business and consistent with past practice.  For the avoidance of doubt, the Debtors are not seeking relief to pay any Employee that is an Insider under the Non-Insider Bonus Programs.

**F.    Non-Insider Severance Program.**

31.    In the ordinary course of business, the Debtors provide, at their discretion on an *ad hoc* basis, individual severance payments to certain Employees who are not Insiders ("Non-Insider Employees") in connection with reductions in Employee workforce or other terminations, which are generally negotiated on a case-by-case basis (the "Ad Hoc Non-Insider Severance Program").  Additionally, the Debtors are required to make certain severance payments as a result of laws in foreign jurisdictions, which require statutory garden leave, minimums for notice of termination, and other severance obligations owed by the Debtors to certain of their Non-U.S. Employees (the "Foreign Jurisdiction Non-Insider Severance Program" and, together with the Ad Hoc Non-Insider Severance Program, the "Non-Insider Severance Program").

32.    The Debtors' ability to continue the Non-Insider Severance Program is critical to maintaining Employee morale and ensuring the uninterrupted operation of the Debtors' business.

Failure to maintain the Non-Insider Severance Program could cause increased instability in the Debtors' workforce, which would undermine the Debtors' ability to strengthen their financial and operational foundation, generate growth, and position themselves for long-term success. Further, as previously mentioned, the Foreign Jurisdiction Non-Insider Severance Program is required by law and, in certain jurisdictions, there is director and officer liability if these amounts are not paid on time.

33.     As of the Petition Date, the Debtors estimate that they owe approximately $1,640,000 on account of the Non-Insider Severance Program to 9 former Employees who recently signed separation agreements. Of these, approximately $1,600,000 are owed pursuant to 8 severance agreements that fall under the Foreign Jurisdiction Non-Insider Severance Program and approximately $40,000 is owed pursuant to 1 severance agreement that falls under the Ad Hoc Non-Insider Severance Program. The Debtors seek authority, but not direction, in their business judgement, to pay the prepetition amounts due under the Non-Insider Severance Program, including any amounts above those imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (the "Priority Cap"). The Debtors also seek authority to continue the Non-Insider Severance Program on a postpetition basis in the ordinary course of business and consistent with past practice. For the avoidance of doubt, the Debtors are not seeking relief to pay any Employee or former Employee that is an Insider under the Non-Insider Severance Program.

### G.     Social Plans

34.     In the ordinary course of business and consistent with applicable labor laws and historical practice, the Debtors maintain various social plans (collectively, the "Social Plans") for the benefit of Employees in certain non-U.S. jurisdictions, including, among others, France, Germany, Spain, Netherlands, Italy, and the United Kingdom. These Social Plans provide

non-U.S. Employees with various benefits including medical, dental, vision, retirement, transportation, and other insurance.

35.     Additionally, as part of the Social Plans, the Debtors provide certain non-U.S. Employees with benefits under various pension plans (the "Pension Plans"). The Debtors paid approximately $7 million in ordinary course payments to the Pension Plans in the twelve months immediately preceding the Petition Date.

36.     As of the Petition Date, the Debtors estimate that they owe approximately $4,800,000 on account of the Social Plans. This includes the amounts the Debtors owe with respect to the Pension Plans. The Debtors seek authority, but not direction, to (a) pay any prepetition amounts due under the Social Plans; and (b) continue the Social Plans on a postpetition basis in the ordinary course of business and consistent with past practice.

**H.     Withholding Obligations.**

37.     In the ordinary course of business, the Debtors incur obligations on account of Payroll Deductions and Payroll Taxes (each as defined below and collectively, the "Withholding Obligations"), as described herein. Moreover, the Debtors also are required by law to withhold from the amounts paid to Employees under the Compensation and Benefits Programs amounts related to, among other things as set forth below, federal, state, local, and foreign income taxes, and Social Security and Medicare taxes for remittance to the appropriate federal, state, local, and foreign taxing authorities. As of the Petition Date, the Debtors estimate that they owe approximately $6,100,000 in the aggregate on account of Withholding Obligations. As further described herein, the Debtors believe that the Withholding Obligations are not property of their estates because the Debtors are merely holding such obligations in trust on another party's behalf. However, out of an abundance of caution, the Debtors seek authority to pay any prepetition Withholding Obligations to the respective third-party payees and continue to honor

15

and process the Withholding Obligations on a postpetition basis in the ordinary course of business and consistent with past practice.

### i. Payroll Deductions.

38.     During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation (a) pre- and post-tax deductions payable pursuant to certain of the Employee Benefits Programs (as defined herein), health insurance premiums and retirement savings contributions, (b) social plan (including pension plan) contributions where applicable, (c) union contributions where applicable, (d) garnishments, child support and service charges, and other similar deductions, and (e) other withholdings as may be required in the various jurisdictions in which the Debtors operate (collectively, the "Payroll Deductions"), and forward the Payroll Deductions to various third-party recipients.

39.     As of the Petition Date, the Debtors estimate that they owe approximately $2,700,000 on account of accrued but unpaid Payroll Deductions.  The Debtors seek authority to make payments on account of Payroll Deductions, all of which will be available upon entry of the Order.  The Debtors believe that that the unpaid Payroll Deductions generally are held in trust by the Debtors and are not property of their estates.  Out of an abundance of caution, however, the Debtors seek authority to continue to honor any unpaid Payroll Deductions and to pay any prepetition claims with respect thereto, including to third-party payees, in the ordinary course of business and consistent with past practice.

### ii. Payroll Taxes.[7]

40.     In addition to the Payroll Deductions, certain laws require that the Debtors withhold amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities (the "U.S. Employee Payroll Taxes").   The Debtors must then match the U.S. Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (the "Employer Payroll Taxes" and, together with the U.S. Employee Payroll Taxes, the "U.S. Payroll Taxes").   The Debtors also have similar obligations to foreign taxing authorities under the laws of the non-U.S. jurisdictions in which they operate (the "Non-U.S. Employer Payroll Taxes" and the "Non-U.S. Employee Payroll Taxes," collectively with U.S. Payroll Taxes, the "Payroll Taxes").   The Payroll Taxes are generally processed and forwarded to the appropriate U.S. and Non-U.S. taxing authorities in accordance with remittance intervals and deadlines established by those taxing authorities.

41.     As of the Petition Date, the Debtors estimate that they owe approximately $3,400,000 on account of the Payroll Taxes.  Accordingly, the Debtors request authority to pay all outstanding prepetition amounts incurred on account of the Payroll Taxes and to continue paying the Payroll Taxes on a postpetition basis in the ordinary course and consistent with prepetition practice.

---

[7]     For the avoidance of doubt, the Debtors seek authority to pay Payroll Taxes pursuant to this motion and not in the *Debtors' Emergency Motion for Entry of an Order(I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees, and (II) Granting Related Relief*] filed contemporaneously herewith.

#### I. Payroll Processing Fees.

42.     In the ordinary course of business, Employee Compensation and Withholding Obligations are processed and administered through various third-party administrators, including: (a) Automatic Data Processing, Inc. ("ADP") for Employees located in the United States and Germany; (b) SD Worx UK LTD for Employees located in the United Kingdom; (c) Talentia for Employees located in France; (d) Personnel Consultancy Agency Lap for Employees located in the Netherlands; and (e) Seresco, SA for Employees located in Spain  (collectively, the "Payroll Processors").  Payroll Processers assist in the calculation of Employee Compensation and Withholding Obligations and, in certain instances, facilitate the withdrawal of funds from the Debtors' bank accounts and ultimate disbursements of wages, benefits, and taxes.  The Debtors incur fees on account of the services provided by the Payroll Processors (the "Payroll Processing Fees").  Failure to satisfy the Payroll Processing Fees could lead to a delay in payroll processing and disbursement of payroll taxes to the appropriate third parties to the detriment of the Employees and the Debtors' operations.  Continuing to pay the Payroll Processing Fees, and thus preserving the Debtors' ability to continue administering payroll, is critical to the Debtors' continued operations while in chapter 11.

43.     As of the Petition Date, the Debtors estimate that they owe approximately $200,000 on account of accrued but unpaid Payroll Processing Fees.  Accordingly, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Payroll Processing Fees and to continue paying the Payroll Processing Fees on a postpetition basis in the ordinary course and consistent with prepetition practice.

#### II.     Employee Benefits Programs.

44.     The Debtors offer their Employees the ability to participate in a number of insurance and benefits programs, including, among others, (a) Health and Welfare Coverage and

Benefits, (b) Life and Disability Insurance Coverage, (c) the Workers' Compensation Program, (d) the 401(k) Plan, (e) Time-Off Benefits, and (f) the Additional Benefit Programs (each as defined herein and, collectively, the "Employee Benefits Programs").

45.     As of the Petition Date, the Debtors estimate that they owe approximately $10,370,000 on account of the Employee Benefits Programs.  Accordingly, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts owed on account of the Employee Benefits Programs and to continue paying the Employee Benefits Programs on a postpetition basis in the ordinary course and consistent with prepetition practice.

### A.     Health and Welfare Coverage and Benefits.

46.     In the ordinary course of business, the Debtors offer their Employees the ability to participate in a number of health insurance and benefits programs, including, among other programs, medical, dental, and vision coverage plans (collectively, the "Health and Welfare Coverage and Benefits").  The Health and Welfare Coverage and Benefits are, in each case, available to certain Employees depending on factors including their position within the business, their length of service, and location (the "Eligible Employees").  The Debtors also subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), whereby former Employees pay Optum Inc., a third-party health care company, which forwards premiums related to COBRA to the Debtors.

47.     The Health and Welfare Coverage and Benefits include, but are not limited to, the Medical Plan and the Vision and Dental Plan (each as defined below).  The Debtors provide Eligible U.S. Employees with medical and prescription coverage (the "U.S. Medical Plan") through Anthem Blue Cross Blue Shield.  Eligible U.S. Employees contribute to the cost of the

Medical Plan through payroll deductions during each pay period.  The U.S. Medical Plan coverage is self-funded by the Debtors.  In addition, eligible U.S. Employees enrolled in participating U.S. Medical Plans can utilize a Health Savings Account ("HSA") or a Health Care Flexible Spending Account ("FSA") provided by Inspira Financial to directly pay for healthcare expenses with tax-free dollars.  For an Employee enrolled in an HSA, the applicable Debtor provides an annual HSA contribution of up to $500 for individuals or $1,000 if the HSA covers dependents.  In certain foreign jurisdictions, Non-U.S. Employees obtain coverage through government-subsidized programs, or—for certain Non-U.S. Employees—may participate in private medical insurance sponsored by the Debtors.

48.     Additionally, the Debtors offer their U.S. Employees the opportunity to participate in additional health benefit plans, such as a dental plan and a vision plan (such coverage, the "U.S. Vision and Dental Plans").  The U.S. Vision and Dental Plans are administered by United Healthcare and Delta Dental of Virginia, respectfully.  Under the U.S. Vision and Dental Plans, participants and their eligible dependents receive coverage for, among other things, preventative and diagnostic services, eye exams, vision correction, and various other vision and dental treatments.

49.     Failing to continue the Health and Welfare Coverage and Benefits could cause Employees to experience severe hardship and render it extremely difficult to retain the Debtors' workforce.  Because the Debtors self-fund certain of the programs under Health and Welfare Coverage and Benefits, Employees may submit prepetition claims for processing after the Petition Date.[8]  As of the Petition Date, the Debtors estimate they owe approximately $3,400,000 on account of unpaid Health and Welfare Coverage and Benefits.  Accordingly, the Debtors request

---

[8]     The Debtors' self-funded plan has a stop-loss insurance through Voya of $250,000 per qualifying incident.

authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Health and Welfare Coverage and Benefits and to continue paying the Health and Welfare Coverage and Benefits on a postpetition basis in the ordinary course and consistent with prepetition practice.

**B.    Life and Disability Insurance Coverage.**

50.    The Debtors provide eligible Employees with life insurance and long-term disability insurance ("Life and Disability Insurance Coverage").   In the United States, the Debtors' life insurance and long-term disability insurance plans are administered by Prudential for U.S. Employees (the "U.S. Life and Disability Insurance Coverage").   Certain short-term disability services are also covered under the U.S. Life and Disability Insurance Coverage.   The Debtors pay the insurance providers approximately $1.8 million per year to administer the U.S. Life and Disability Insurance Coverage.

51.    The Debtors also provide certain eligible Non-U.S. Employees with Life and Disability Insurance Coverage (the "Non-U.S. Life and Disability Insurance Coverage").   The exact coverage and the provider depends on the country.

52.    As of the Petition Date, the Debtors estimate they owe approximately $140,000 on account of unpaid Life and Disability Insurance Coverage.   Accordingly, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Life and Disability Insurance Coverage and to continue paying the Life and Disability Insurance Coverage on a postpetition basis in the ordinary course and consistent with prepetition practice.

**C.    Workers' Compensation.**

53.    In the ordinary course of business, the Debtors maintain workers' compensation insurance coverage in accordance with applicable requirements in the United States (the "U.S. Workers' Compensation Program") and comparable programs in other jurisdictions around the

world as required by local laws (the "Foreign Workers' Compensation Programs" and, together with the U.S. Workers' Compensation Program, the "Workers' Compensation Programs").

54.     The Hartford Fire Insurance Company ("Hartford") is the main administrator of the U.S. Workers' Compensation Program.  For the 2025 policy year, the Debtors paid Hartford approximately $350,000 in monthly premium deposits that concluded in August 2025 and have no outstanding premiums for the remainder of the calendar year.  The U.S. Workers' Compensation Program is subject to a $250,000 deductible payable by the Debtors for every claim submitted, with Hartford providing coverage for amounts in excess of the deductible up to $1 million.  Additionally, pursuant to certain state laws, the Debtors maintain insurance coverage through different providers.  For example, in Ohio, the U.S. Workers' Compensation is administered by the Ohio Bureau of Workers Compensation and the Debtors pay a monthly premium for this program.

55.     As of the Petition Date, the Debtors estimate that there are seven (7) open claims under the U.S. Workers' Compensation Program, potentially resulting in approximately $260,000 in accrued and unpaid claims.

56.     Chubb Group of Insurance Companies ("Chubb Insurance") is the main administrator of the Foreign Workers' Compensation Programs.  Under the Foreign Workers' Compensation Programs, the Debtors generally pay premiums for workers' compensation coverage administered through government-managed programs in the jurisdictions where they operate.  In most cases, the taxes that the Debtors withhold and remit to the relevant authorities in those jurisdictions include the Debtors' premium obligations under the Foreign Workers' Compensation Programs, and governmental entities are responsible for assessment, determination, adjudication, and payment of claims.  The Debtors have paid Chubb Insurance's

premiums for coverage for the 2025 policy year.  As of the Petition Date, the Debtors estimate that there are 14 open claims under the Foreign Workers' Compensation Program, potentially resulting in approximately $100,000 in accrued and unpaid claims.

57.    For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual and legal obligations, the Debtors must continue to assess, determine, adjudicate, and pay claims brought under the Workers' Compensation Programs during these chapter 11 cases.  Further, because the Debtors may be statutorily and/or contractually obligated to maintain the Workers' Compensation Programs, their inability to do so may result in adverse legal consequences that would disrupt the chapter 11 process.

58.    As of the Petition Date, the Debtors estimate that the aggregate amount of accrued open claims and premiums on account of the Workers' Compensation Programs is approximately $530,000.  Accordingly, the Debtors request authority to pay all outstanding prepetition amounts incurred on account of the Workers' Compensation Programs and to continue the Workers' Compensation Programs on a postpetition basis in the ordinary course and consistent with prepetition practice.  Moreover, the Workers' Compensation Programs may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  The Debtors request authority to continue making all payments related to Workers' Compensation Programs postpetition, including making changes to current policy and practices that become necessary.

59.    In addition, to the extent any Employees assert claims arising under the Workers' Compensation Program during these chapter 11 cases, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed

23

with such claims.  This requested modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

### D. The 401(k) Plan.

60.     The Debtors maintain a retirement savings plan for the benefit of their U.S. Employees that satisfies the requirements of section 401(k) of the Internal Revenue Code (the "401(k) Plan").  The 401(k) Plan is administered by Klockner Pentaplast of America, Inc., with TruStage as the Recordkeeper and Administrator and Matrix Trust Company as Trustee, and allows for automatic pre-tax deductions and post-tax Roth IRA deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.  Each pay period, the Debtors deduct 401(k) Plan contributions from the applicable Employees' paychecks (the "401(k) Deductions").   The Debtors match up to five percent of Employees' 401(k) contributions (the "401(k) Matching Contributions," and together with the 401(k) Deductions, the "401(k) Obligations").  Specifically, the Debtors will match 100 percent of the initial four percent of Employees' 401(k) contributions, and after that, the Debtors will match 50 percent of the next two percent of Employees 401(k) contributions.  The Debtors pay these amounts to Matrix Trust Company to hold and invest in the 401(k) accounts.

61.     Many Employees' retirement savings consist primarily of the 401(k) Plan.  Thus, the Debtors believe that continuing the 401(k) Plan is essential to maintaining Employee morale and protecting Employee expectations.   In addition, the Debtors believe that the 401(k) Deductions are generally held in trust by the Debtors and are not property of their estates.

62.     As of the Petition Date, the Debtors estimate that they owe approximately $300,000 on account of the 401(k) Obligations.  Accordingly, the Debtors seek authority, but not direction, to (a) continue the 401(k) Plan on a postpetition basis in the ordinary course of business and consistent with past practice and (b) honor all unremitted 401(k) Obligations in the ordinary

course of business and consistent with past practice and to pay any prepetition claims with respect thereto.

### E.    Time-Off Benefits.

63.    In the ordinary course of business, the Debtors offer several forms of paid time-off benefits to Employees for vacation, sick days, and holidays (collectively, the "PTO Benefits"). These PTO Benefits vary based on the Employee's country as well as if the Employee is considered a salaried or an hourly worker.[9]   The Debtors also provide paid leave benefit programs (the "Paid Leave Benefits," and together with the PTO Benefits, the "Time-Off Benefits") for eligible Employees.   Continuing the Time-Off Benefits consistent with prior practice is essential to maintaining Employee morale during these chapter 11 cases.   The policies at issue are broad-based programs upon which all Employees have come to depend.   As of the Petition Date, the Debtors estimate they owe approximately $5,000,000 on account of accrued and unpaid Time-Off Benefits.   Accordingly, the Debtors request authority, but not direction, to pay all outstanding prepetition amounts incurred on account of the Time-Off Benefits and to continue paying the Time-Off Benefits on a postpetition basis in the ordinary course and consistent with prepetition practice.

### F.    Additional Benefit Programs.

64.    In addition to the foregoing, the Debtors offer U.S. and Non-U.S. Employees a range of ancillary benefits (the "Additional Benefit Programs"), including, among other things: (a) confidential counselling and referral services for mental health; (b) discretionary tuition reimbursement for education and training that meets certain criteria; (c) reimbursement for safety

---

[9]    For example, in the United Kingdom and France, Employees are afforded up to or more than twenty days of PTO Benefits.  In the United States, salaried employees are afforded unlimited exempted PTO Benefits, and up to a maximum of six weeks non-exempt PTO Benefits.

shoes and prescription safety glasses; (d) the Harry van Beek College Scholarship which provides financial assistance to eligible children of the Employees; (e) accident and critical illness insurance; (f) chronic disease management services; (g) physical therapy services; (h) snacks and beverages; and (i) car lease payments and employee allowances on behalf of certain employees. As of the Petition Date, the Debtors estimate that they owe $1,000,000 on account of the unpaid Additional Benefit Programs.  Many of the Employees have come to rely on the Additional Benefit Programs in the course of fulfilling their professional responsibilities and maintaining these programs is important to Employee retention and morale.  The Debtors seek authority to continue to honor all obligations related to all Additional Benefit Programs in the ordinary course of business and consistent with past practice.

### III.    Union Contributions.[10]

65.    The Union Employees are often responsible for paying dues owed to their respective Unions.  In some jurisdictions, however, the Debtors are required to make contributions to certain foreign unions.

66.    As of the Petition Date, the Debtors estimate they owe de minimis amounts on account of Union Contributions.  Accordingly, the Debtors request authority, but not direction, to pay any outstanding prepetition amounts incurred on account of the Union Contributions and to continue paying the Union Contributions on a postpetition basis in the ordinary course and consistent with prepetition practice.  The Debtors also seek authority to continue to honor all obligations to the Union Employees on a postpetition basis in the ordinary course of business and consistent with past practice.

---

[10]    By requesting authority to honor obligations relating to any collective bargaining agreement in this motion, the Debtors are not assuming or affirming any contracts, agreements, programs, or the applicability of any law related to any collective bargaining agreement and the Debtors reserve all of their rights with regard to any collective bargaining agreement.

IV.     **Non-Employee Manager Compensation.**

67.     The board of managers of Debtor Kleopatra Senior Holdings GP S.à r.l. (the "Board") consists of (a) the Debtors' chief executive officer, (b) three Employee managers, and (c) five non-Employee managers (collectively, the "Non-Employee Managers").  The Non-Employee Managers receive monthly cash compensation for their services as well as reimbursement for reasonable out-of-pocket expenses in connection with travel related to their Board duties (such reimbursements, together with the monthly cash payments described above, the "Non-Employee Manager Compensation").The Non-Employee Managers perform a crucial role in the Debtors' governance and strategic decision-making, and their service is vital in ensuring that the Debtors continue to conform to governance best practices.

68.     The Debtors do not owe any amounts on account of unpaid Non-Employee Manager Compensation as of the Petition Date.  The Debtors seek authority to continue to honor the Non-Employee Manager Compensation in the ordinary course of business and consistent with past practice.

## Basis for Relief

I.     **Sufficient Cause Exists to Authorize the Debtors to Honor the Compensation and Benefits Obligations.**

A.     **Certain of the Compensation and Benefits Programs Are Entitled to Priority Treatment.**

69.     Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Compensation and Benefits Programs to priority treatment to the extent such payments do not exceed $17,150 for each individual.  The Debtors are required to pay these priority claims in full to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code for (a) wages, salaries, or commissions, including vacation, severance, and sick leave pay

earned by an individual and (b) contributions to an employee benefit plan). To the extent that an Employee receives no more than the Priority Cap on account of claims entitled to priority, the relief sought with respect to compensation only affects the timing of certain payments to Employees and does not have any material negative impact on recoveries for general unsecured creditors, aside from the request to exceed the Priority Cap in narrow circumstances. The Debtors submit that payment of the Compensation and Benefits Programs at this time enhances the value described herein for the benefit of all interested parties. *See In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 370 (Bankr. S.D. Tex. 2000) ("The need to pay [employee wage] claims in an ordinary course of business time frame is simple common sense. Employees are more likely to stay in place and to refrain from actions which could be detrimental to the case and/or the estate if their pay and benefits remain intact and uninterrupted."). To the extent that an Employee or former Non-Insider Employee is owed more than the Priority Cap on account of the Non-Insider Severance Program, the full payment of such obligations in the ordinary course is warranted under section 363(b)(1) of the Bankruptcy Code and the doctrine of necessity.

70. The Employees are essential to the success of these chapter 11 cases and the Debtors' business. As such, payment of the Compensation and Benefits Programs at this time is necessary to avoid potential material disruption to the Debtors' ordinary-course operations. Finding, attracting, and training new qualified talent would be extremely difficult, particularly given current labor market conditions. Such recruitment efforts would most likely require, among other things, higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees. Even if ultimately successful, in the interim, the Debtors would face personnel vacancies at a critical business juncture and, once replacement personnel were hired, leave the Debtors to invest additional resources in training new staff

28

members.  The additional uncertainty created by needing to expend time, manpower, and money recruiting and training new personnel at a critical time would be non-accretive.  Losing the Debtors' significant talent base would create additional challenges to maintaining going-concern value during these chapter 11 cases.

71.      Furthermore, to avoid potentially costly disputes that could reduce the value of the Debtors' estates, as well as ease potential concerns from non-terminated Employees regarding ongoing Compensation and Benefits Programs, it is necessary to pay any accrued but unpaid Compensation and Benefits Programs owed to recently terminated Employees.

**B.      Paying Certain Compensation and Benefits Is Required by Law.**

72.      The Debtors request authority to pay the Withholding Obligations to the appropriate third-party payees.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d); *see also In re Equalnet Commc'ns*, 258 B.R. at 370 (noting that, for tax obligations where funds are held by the debtor in trust, "the legal right to payment of such claims at any time appears irrefutable.") (citing *In re Al Copeland Enter., Inc.*, 991 F.2d 233 (5th Cir. 1993)).

73.      Furthermore, certain laws require the Debtors to withhold certain tax payments from Employees' wages and to pay such amounts to the appropriate taxing authority.  *See* 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that

individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request authority to transmit the Withholding Obligations to the proper parties in the ordinary course of business.

74.     Similarly, the laws of some jurisdictions require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, the laws of those jurisdictions may prohibit the Debtors from operating in those states. Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the success of these chapter 11 cases.

75.     The Debtors therefore request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business and consistent with past practice.

## II.     Paying Compensation and Benefits Is Warranted Under Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

76.     Section 363(c)(1) of the Bankruptcy Code expressly grants the Debtors the authority to "enter into transactions . . . in the ordinary course of business" and "use property of the estate in the ordinary course of business without notice or a hearing."  Therefore, the Debtors believe they are permitted to pay all postpetition amounts due pursuant to the Compensation and Benefits Programs as such actions are in the ordinary course of the Debtors' business.  Out of an abundance of caution, however, the Debtors seek entry of an order granting the relief requested herein to avoid any destruction to the value of their estates.

77.     Payment of prepetition obligations is appropriate where necessary to protect and preserve the estate, including an operating business's going-concern value.

See, e.g., In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity").  Several legal theories rooted in sections 105(a), 363(b), and 1107(a) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

78.    Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons.  See, e.g., Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.), 780 F.2d 1223, 1226 (5th Cir. 1986) ("That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (citation omitted); see also Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification).

79.    Under section 1107(a) of the Bankruptcy Code, a debtor in possession has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'"  In re CEI Roofing, Inc., 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting In re CoServ, 273 B.R. at 497).  Courts also apply section 105(a) pursuant to the "doctrine of necessity," which functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of

critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ*, 273 B.R. at 497. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *In re Ionosphere Clubs*, 98 B.R. at 176. The above-referenced sections of the Bankruptcy Code therefore authorize the postpetition payment of prepetition claims when the payments are critical to preserving the going-concern value of the debtor's estate, as is the case here.

80.     Payment of the Compensation and Benefits Programs represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates and is therefore justified under sections 105(a), 363(b), and 1107 of the Bankruptcy Code. Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. The Employees are essential to the success of these chapter 11 cases. As the Debtors seek to effectuate a value-maximizing restructuring, it is imperative that the Employees remain fully engaged, motivated, and productive. Absent timely payment of amounts owed to Employees, the Debtors risk workforce attrition and resulting business disruption, which stands to materially impair estate value. Paying the amounts that arise under the Compensation and Benefits Programs in the ordinary course will help minimize the adverse effect of commencement of these chapter 11 cases on the Debtors' business operations as they pursue a value-maximizing restructuring.

81.     In addition, the majority of the Employees, rely exclusively on the Compensation and Benefits Programs to satisfy their daily living expenses and expect and require that their wages be paid on a timely basis. Consequently, the Employees will be exposed to significant

32

financial difficulties if the Debtors are not permitted to pay Compensation and Benefits in the ordinary course.  Failure to timely satisfy such obligations will also jeopardize workforce morale and loyalty at this crucial time when needed most.  Furthermore, if this Court does not grant the relief requested herein, Employees will not receive health coverage and thus may be obligated to pay certain health care claims that the Debtors have not satisfied.  The loss of health care coverage will result in considerable anxiety for Employees at a time when the Debtors need all Employees to perform their best.  Accordingly, the relief requested herein is a necessary and critical element of the Debtors' efforts to maximize estate value and will give the Debtors the greatest likelihood of retention of their workforce as the Debtors seek to operate their business in these chapter 11 cases.

82.     The Debtors request that this Court authorize, but not direct, the Debtors to pay and continue the Compensation and Benefits Programs in the ordinary course of business and consistent with past practices on a final basis from the outset of these cases.  The importance of a debtor's workforce to its operations has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein.  *See, e.g. In Ascend Performance Materials Holdings, Inc.,* No. 25-90127 (CML) (Bankr. S.D. Tex. April 22, 2025)*,* (authorizing the debtors to pay prepetition employee wages, salaries, other compensation, and reimbursable expenses, and continue employee benefits program); *In re Glob. Clean Energy Holdings, Inc.*, No. 25-90113 (ARP) (Bankr. S.D. Tex. April 16, 2025) (same); *In re Vertex Energy, Inc.*, No. 24-90507 (CML) (Bankr. S.D. Tex. Sept. 25, 2024) (same); *In re Digit. Media Sols., Inc.*, No. 24-90468 (ARP) (Bankr. S.D. Tex. Sept. 13, 2024) (same); *In re SmileDirectClub, Inc.*, No. 23-90786 (CML) (Bankr. S.D. Tex. Oct. 2, 2023) (same).[11]

---

[11]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

83.     Accordingly, the Debtors request authority to continue the Compensation and

Benefits and pay related obligations in the ordinary course of business.

## III.    A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

84.     Section 362(a) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or
> employment of process, of a judicial, administrative, or other action
> or proceeding against the debtor that was or could have been
> commenced before the commencement of the case under this title,
> or to recover a claim against the debtor that arose before the
> commencement of the case under this title[.]

11 U.S.C. § 362(a)(1).  Section 362 of the Bankruptcy Code, however, permits a debtor or other

parties in interest to request a modification or termination of the automatic stay for "cause."

*Id.* at § 362(d)(1).

85.     Pursuant to section 362(d) of the Bankruptcy Code, the Debtors seek to modify the

automatic stay to permit Employees to proceed with their workers' compensation claims in the

appropriate judicial or administrative forum.  Cause exists here to modify the automatic stay

because staying the workers' compensation claims could have a detrimental effect on the financial

wellbeing and morale of certain Employees and lead to the departure of Employees who are

critical at this juncture.  Such departures could cause a severe disruption in the Debtors' business,

which would be to the detriment of all parties in interest.

### Emergency Consideration

86.     The Debtors request emergency consideration of this motion in accordance with

Bankruptcy Local Rule 9013-1 and pursuant to Bankruptcy Rule 6003, which empowers a court

to grant relief within the first 21 days after the commencement of a chapter 11 case to the extent

that "relief is needed to avoid immediate and irreparable harm."  An immediate and orderly

transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive

the requested relief during the first 21 days of these chapter 11 cases would imperil the Debtors' restructuring and cause irreparable harm.  The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm" as contemplated by Bankruptcy Rule 6003, and request that the Court approve the relief requested in this motion on an emergency basis.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

87.     The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing and the consensual use of cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority to authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks, direct debit, wire transfer, ACH, or other payment requests in respect of the relief requested in this motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

88.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

89.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an admission as to the amount, validity, or priority of, or basis for, any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission

as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Notice

90.     The Debtors will provide notice of this motion to the following parties or their respective counsel:  (a) the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the Internal Revenue Service; (e) the DIP Agent; (f) the Prepetition Agents; (g) the Ad Hoc Group; (h) the SVP Funds; (i) the Factors; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice is required.

WHEREFORE, the Debtors request that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: November 5, 2025
Houston, Texas

*/s/ John F. Higgins*

**PORTER HEDGES LLP**
John F. Higgins (TX Bar No. 09597500)
Eric M. English (TX Bar No. 24062714)
M. Shane Johnson (TX Bar No. 24083263)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX Bar No. 24122842)
Joanna D. Caytas (TX Bar No. 24127230)
1000 Main St., 36th Floor
Houston, Texas 77002
Telephone:      (713) 226-6000
Facsimile:      (713) 226-6248
Email:          jhiggins@porterhedges.com
                sjohnson@porterhedges.com
                myoung-john@porterhedges.com
                jkeefe@porterhedges.com
                jcaytas@porterhedges.com

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com

-and-

Chad J. Husnick, P.C. (*pro hac vice* pending)
John R. Luze, P.C. (*pro hac vice* pending)
Jeffrey T. Michalik (*pro hac vice* pending)
David R. Gremling (*pro hac vice* pending)
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          chad.husnick@kirkland.com
                john.luze@kirkland.com
                jeff.michalik@kirkland.com
                dave.gremling@kirkland.com

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

*Proposed Co-Counsel for the Debtors*
*and Debtors in Possession*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Marc Rotella*
Marc Rotella

**Certificate of Service**

I certify that on November 5, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.  Additionally, the foregoing document will be served as set forth in a forthcoming affidavit filed by the Debtors' proposed claims agent.

*/s/ John F. Higgins*
John F. Higgins